Filed 5/1/23 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| COUNTY OF BUTTE, | C071785 |
| Plaintiff and Appellant, | (Super. Ct. No. CVCV091258)** |
| v. | |
| DEPARTMENT OF WATER RESOURCES, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Respondent; | |
| STATE WATER CONTRACTORS, INC., et al., Real Parties in Interest and Respondents. | NO CHANGE IN JUDGMENT |
| COUNTY OF PLUMAS et al., | |
| Plaintiffs and Appellants, | |
| v. | |
| DEPARTMENT OF WATER RESOURCES, | |
| Defendant and Respondent; | |
| STATE WATER CONTRACTORS, INC., et al., Real Parties in Interest and Respondents. | |

---

** Two cases (Nos. 144282, 144283) were consolidated and transferred from the Butte County Superior Court to the Yolo County Superior Court (No. CVCV091258).

1

THE COURT:

It is ordered that the opinion filed herein on April 7, 2023, be modified as follows:

1.  On page 16, the second sentence of the first full paragraph, beginning "And while true that DWR did not discuss" is deleted and the following sentence is inserted in its place:

    And while true that DWR did not discuss each of these authorities in its EIR, it still conveyed much of the same type of information.

This modification does not change the judgment. Appellants' petition for rehearing is denied.

FOR THE COURT:


_____/s/_____
ROBIE, Acting P. J.


_____/s/_____
HULL, J.


_____/s/_____
BOULWARE EURIE, J.

EDITORIAL LISTING

APPEAL from a judgment of the Superior Court of Yolo County, Daniel P. Maguire, Judge.  Affirmed.

Bruce Alpert, Brad J. Stephens, County Counsel; Rossmann and Moore, Antonio Rossmann, Roger B. Moore, Barton Lounsbury; Law Office of Roger B. Moore, Roger B. Moore; Shute Mihaly & Weinberger and Ellison Folk for Plaintiff and Appellant County of Butte.

R. Craig Settlemire, Gretchen Stuhr, County Counsel; Law Office of Roger B. Moore, Roger B. Moore; Law Offices of Michael B. Jackson and Michael B. Jackson for Plaintiffs and Appellants County of Plumas and Plumas County Flood Control and Water Conservation District.

E. Robert Wright for Friends of the River and the California Sportfishing Protection Alliance as Amici Curiae on behalf of Plaintiffs and Appellants.

Kamala D. Harris, Xavier Becerra, and Rob Bonta, Attorneys General, Robert W. Byrne, Assistant Attorney General, Randy L. Barrow, Tracy L. Winsor, Deborah L. Barnes, Russell B. Hildreth and Matthew J. Goldman, Deputy Attorneys General, for Defendant and Respondent.

The Sohagi Law Group, Margaret M. Sohagi, Philip A. Seymour; Duane Morris, Thomas M. Berliner, Paul J. Killion, Jolie-Anne S. Ansley; Downey Brand, David R.E. Aladjem, Meredith Nikkel and Rebecca R.A. Smith for Real Parties in Interest and Respondents.

Filed 4/7/2023 (unmodified opinion)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| COUNTY OF BUTTE, | C071785 |
| Plaintiff and Appellant, | (Super. Ct. No. CVCV091258)<b>\*</b> |
| v. | |
| DEPARTMENT OF WATER RESOURCES, | OPINION ON TRANSFER |
| Defendant and Respondent; | |
| STATE WATER CONTRACTORS, INC., et al., <br> Real Parties in Interest and Respondents. | |
| COUNTY OF PLUMAS et al., | |
| Plaintiffs and Appellants, | |
| v. | |
| DEPARTMENT OF WATER RESOURCES, | |
| Defendant and Respondent; | |
| STATE WATER CONTRACTORS, INC., et al., <br> Real Parties in Interest and Respondents. | |

**\*** Two cases (Nos. 144282, 144283) were consolidated and transferred from the Butte County Superior Court to the Yolo County Superior Court (No. CVCV091258).

1

APPEAL from a judgment of the Superior Court of Yolo County, Daniel P. Maguire, Judge.  Affirmed.

Bruce Alpert, Brad J. Stephens, County Counsel; Rossmann and Moore, Antonio Rossmann, Roger B. Moore, Barton Lounsbury; Law Office of Roger B. Moore, Roger B. Moore; Shute Mihaly & Weinberger and Ellison Folk for Plaintiff and Appellant County of Butte.

R. Craig Settlemire, Gretchen Stuhr, County Counsel; Law Office of Roger B. Moore, Roger B. Moore; Law Offices of Michael B. Jackson and Michael B. Jackson for Plaintiffs and Appellants County of Plumas and Plumas County Flood Control and Water Conservation District.

E. Robert Wright for Friends of the River and the California Sportfishing Protection Alliance as Amici Curiae on behalf of Plaintiffs and Appellants.

Kamala D. Harris, Xavier Becerra, and Rob Bonta, Attorneys General, Robert W. Byrne, Assistant Attorney General, Randy L. Barrow, Tracy L. Winsor, Deborah L. Barnes, Russell B. Hildreth and Matthew J. Goldman, Deputy Attorneys General, for Defendant and Respondent.

The Sohagi Law Group, Margaret M. Sohagi, Philip A. Seymour; Duane Morris, Thomas M. Berliner, Paul J. Killion, Jolie-Anne S. Ansley; Downey Brand, David R.E. Aladjem, Meredith Nikkel and Rebecca R.A. Smith for Real Parties in Interest and Respondents.


This case concerns California's efforts to relicense its hydropower facilities at Oroville Dam (the Oroville Facilities).  Federal authorities initially licensed these facilities—which are part of the State Water Project (SWP)—in 1957 for a 50-year period.  Before the license expired, California's Department of Water Resources (DWR) began the process for relicensing these facilities.  It also, in connection with this effort, prepared a statement of potential environmental impacts, known as an environmental impact report or EIR, under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.).

Three local governments—Butte County, Plumas County, and Plumas County Flood Control and Water Conservation District (together, the Counties)—afterward filed

2

writ petitions challenging the sufficiency of DWR's EIR. They raised four principal arguments. First, they asserted the EIR failed to adequately account for climate change. Second, they contended the EIR failed to properly evaluate fiscal impacts to Butte County and public health impacts from toxic contaminants. Third, they alleged the EIR wrongly assumed that current facility operations comply with water quality standards. And fourth, they contended the EIR failed to account for potential changes to the SWP that could affect the Oroville Facilities. But the trial court found none of these arguments persuasive and entered judgment in DWR's favor.

On appeal, we consider this case for the third time. In our first decision, we found the Counties' challenge largely preempted by the Federal Power Act (16 U.S.C. § 791a et seq.). (*County of Butte v. Department of Water Resources* (2022) 13 Cal.5th 612, 619 (*County of Butte*).) But our Supreme Court vacated our decision and asked us to reconsider in light of one of its precedents. (*Ibid.*) In our second decision, we again found the Counties' challenge largely preempted. (*Id.* at pp. 619-620.) But our Supreme Court, taking up the case a second time, reversed our decision in part. While the court agreed that some of the remedies the Counties sought were preempted, it found they could still challenge the sufficiency of DWR's EIR. (*Id.* at p. 637.) It thus remanded the matter to our court for further consideration. Turning to the merits for the first time since this appeal was filed over a decade ago, we now affirm.

BACKGROUND

I

*The Oroville Facilities and the State Water Project*

In 1951, the California Legislature authorized the construction of a major water storage and delivery system. (*Planning & Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 898.) The resulting development, the SWP, is one of the largest water storage and delivery systems in the United States. (*San Luis & Delta-Mendota Water Authority v. Jewell* (9th Cir. 2014) 747 F.3d 581, 592; *In re Bay-Delta*

3

*etc.* (2008) 43 Cal.4th 1143, 1154.)  It includes "a series of 21 dams and reservoirs . . ., five power plants, 16 pumping plants, and 662 miles of aqueduct." (*In re Bay-Delta etc.*, at p. 1154, fn. 2.)

The Oroville Facilities, located on the Feather River in Butte County, are part of the SWP.  In the words of the EIR here, the Oroville Facilities are "a critical part of the SWP, providing much of the system's water collection and storage, flood management, and power production capacity."  These facilities include, among other features, Oroville Dam, several smaller dams, the Oroville reservoir (i.e., Lake Oroville), a power plant, two pumping plants, a wildlife area, a fish hatchery, and numerous recreational facilities. Together, these facilities serve multiple purposes, including water supply, hydropower production, flood control, water quality improvement, recreation, and fish and wildlife enhancement.

II

*The Licensing of the Oroville Facilities*

California obtained a 50-year federal license for the Oroville Facilities in 1957. The state needed to obtain a federal license because then, as now, federal law required a federal license for the construction, operation, and maintenance of dams, reservoirs, and hydroelectric power plants.  (16 U.S.C. § 817(1); see *First Iowa Hydro-Electric Coop. v. Federal Power Com.* (1946) 328 U.S. 152, 156.)  Today, the Federal Energy Regulatory Commission (FERC) is charged with issuing these licenses.  (16 U.S.C. § 817(1); see *County of Butte, supra*, 13 Cal.5th at p. 619.)

In 1999, DWR—which operates the SWP—began public preparations to apply to FERC for renewal of the Oroville Facilities license.  (*County of Butte, supra*, 13 Cal.5th at p. 621; *Planning & Conservation League v. Department of Water Resources, supra*, 83 Cal.App.4th at p. 899.)  At the time DWR undertook the relicensing process, FERC regulations allowed applicants to pursue the traditional licensing process or an alternative licensing process.  (*County of Butte,* at p. 621.)  DWR opted for the latter process—a

4

process "designed to achieve consensus among interested parties on the terms of the FERC license before the licensing application is submitted." (*Ibid.*) This process requires those with interest in the project to cooperate in a series of hearings, consultations, and negotiations, and it is intended to conclude with the stakeholders settling their differences and entering into a settlement agreement describing the terms of the proposed license. (*Ibid.*) That agreement "then becomes the centerpiece of the license application and serves as the basis for FERC's 'orderly and expeditious review' in setting the terms of the license." (*Ibid.*) The agreement "is effectively a first draft of the license" that is subject to FERC's final approval. (*Ibid.*)

From 2001 to 2006, DWR and stakeholders from various entities—including five federal agencies, five state agencies, seven local government entities, five Native American tribes, four local water agencies, and 13 nongovernmental organizations—participated in the alternative licensing process for the proposed relicensing of the Oroville Facilities. (*County of Butte, supra*, 13 Cal.5th at p. 621.) After three years of hearings and consultations, and two additional years of negotiations, over 50 parties signed a settlement agreement describing the terms of the proposed license. (*Id.* at p. 622.) The Counties were among those that initially participated in this process, though they elected not to sign the settlement agreement. (*Ibid.*)

The settlement agreement's main provisions are described in two appendices. One appendix contains more than 40 pages of provisions that the agreement's signers intended to be included in the new FERC license. (*County of Butte, supra*, 13 Cal.5th at p. 622.) "These provisions address environmental protection, recreation, protection of cultural properties, flood control, land use, and expenditures." (*Ibid.*) "A second appendix added nearly 20 pages of further provisions that were not intended for inclusion in the new license, but which, as DWR told the trial court, DWR 'nonetheless agreed to undertake to obtain consensus.' " (*Ibid.*) These provisions include, among others, a provision requiring the creation of a fund to benefit communities near the project.

Following the settlement agreement, both FERC and DWR completed environmental review in connection with the proposed relicensing. FERC prepared an environmental impact statement under the National Environmental Policy Act (42 U.S.C. § 4321 et seq.). (*County of Butte, supra*, 13 Cal.5th at pp. 622-623.) DWR, in turn, prepared an EIR under CEQA and "characterized the project under CEQA review as implementation of the settlement agreement, which would allow 'the continued operation and maintenance of the Oroville Facilities for electric power generation.' " (*Id.* at p. 623.) DWR's "EIR is programmatic in nature, meaning it contemplates additional CEQA review in connection with later activities that are part of the project." (*Id.* at p. 635.)

DWR certified the EIR and approved the settlement agreement in 2008. As of this day, FERC has yet to relicense the Oroville Facilities and has instead allowed DWR to operate the facilities under annual, interim licenses. (*County of Butte, supra*, 13 Cal.5th at p. 621.)

### III

### *The Counties' Suit*

In 2008, the Counties filed two writ petitions—which were later consolidated— challenging the sufficiency of DWR's EIR. (*County of Butte, supra*, 13 Cal.5th at p. 625.) Plumas County and Plumas County Flood Control and Water Conservation District filed one of the writ petitions; Butte County filed the other. (*Ibid.*) Both petitions named DWR as respondent and named, among others, State Water Contractors, Inc.; Alameda County Flood Control and Water Conservation District, Zone 7; Kern County Water Agency; San Bernardino Valley Municipal Water District; Santa Clara Valley Water District; and the Metropolitan Water District of Southern California (collectively, SWC) as real parties in interest.

The Counties raised four principal arguments in the trial court. They alleged the EIR evaded analysis of climate change, failed to properly evaluate fiscal impacts to Butte County and public health impacts from toxic contaminants, wrongly assumed that current

6

facility operations comply with water quality standards, and failed to account for potential changes to the SWP that could affect Oroville Facilities operations. The Counties asked the trial court to set aside DWR's EIR, to enjoin DWR from proceeding with the relicensing, and to award them fees and costs.

The trial court rejected the Counties' arguments, finding each of their arguments failed on the merits. In our initial review following the Counties' appeal, we found their claims were largely preempted by the Federal Power Act. (*County of Butte, supra*, 13 Cal.5th at p. 619.) But our Supreme Court vacated our decision and asked us to reconsider in light of *Friends of the Eel River v. North Coast Railroad Authority* (2017) 3 Cal.5th 677. (*County of Butte*, at p. 619.) We then considered the case again and again reached the same conclusion. (*Ibid.*) After our Supreme Court took up the case a second time, it affirmed in part and reversed in part. While it agreed the Counties could not challenge the environmental sufficiency of the settlement agreement or seek to unwind it, it found they could still challenge the sufficiency of DWR's EIR. (*Id.* at p. 637.) It thus remanded the matter to our court for further consideration. (*Ibid.*)

DISCUSSION

I

*CEQA Background*

CEQA serves "to ensure that public agencies will consider the environmental consequences of discretionary projects they propose to carry out or approve." (*Stockton Citizens for Sensible Planning v. City of Stockton* (2010) 48 Cal.4th 481, 488.) To that end, absent an exemption, an agency proposing to carry out or approve a project generally must conduct an initial study to determine "if the project may have a significant

effect on the environment." (Cal. Code. Regs., tit. 14, § 15063, subd. (a).)[1] "If, after performing an initial study, the agency responsible for CEQA compliance, referred to as the 'lead agency,' finds substantial evidence that a project may have a significant environmental impact, the agency must prepare and certify an EIR before approving or proceeding with the project." (*County of Butte, supra*, 13 Cal.5th at p. 627.)

An EIR, as courts have often said, is " " 'the heart of CEQA." ' " (*Cleveland National Forest Foundation v. San Diego Assn. of Governments* (2017) 3 Cal.5th 497, 511 (*Cleveland National Forest Foundation*).) It serves to "(1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, those impacts; (3) require project changes through alternatives or mitigation measures when feasible; and (4) disclose the government's rationale for approving a project." (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 488.) To fulfill these purposes, an "EIR 'must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Cleveland National Forest Foundation*, at p. 511.) But that does not mean an EIR must be exhaustive on all topics. Courts look " 'not for perfection but for adequacy, completeness, and a good faith effort at full disclosure.' " (*In re Bay-Delta etc., supra*, 43 Cal.4th at p. 1175.)

In reviewing an agency's compliance with CEQA, courts review for abuse of discretion. (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512 (*Sierra Club*).) Courts will find an agency abused its discretion if it either failed to proceed in a manner required by law or reached a decision not supported by substantial evidence. (*Ibid.*)

---

[1] California Code of Regulations, title 14, sections 15000-15387 are ordinarily referred to as the CEQA Guidelines. We will use that shorthand to refer to these regulations going forward.

" 'Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, "scrupulously enforc[ing] all legislatively mandated CEQA requirements" [citation], we accord greater deference to the agency's substantive factual conclusions. In reviewing for substantial evidence, the reviewing court "may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable," for, on factual questions, our task "is not to weigh conflicting evidence and determine who has the better argument." ' " (*Ibid.*)

"This distinction between de novo review and substantial evidence review is often straightforward. A contention that an agency has, for example, provided an insufficient amount of time for public comment is subject to de novo review. And a contention that an agency's factual findings are wrong, as a different example, is subject to substantial evidence review. But questions about the relevant standard of review are not always so clear." (*Sierra Watch v. County of Placer* (2021) 69 Cal.App.5th 86, 95.) "This is especially so when the issue is whether an EIR's discussion of environmental impacts is adequate, that is, whether the discussion sufficiently performs the function of facilitating 'informed agency decisionmaking and informed public participation.' " (*Sierra Club*, *supra*, 6 Cal.5th at p. 513.) Those types of "inquir[ies] present[] a mixed question of law and fact" and are "generally subject to independent review." (*Id.* at p. 516; see *id.* at p. 514 ["whether a description of an environmental impact is insufficient because it lacks analysis or omits the magnitude of the impact is not a substantial evidence question"].) But if "factual questions predominate, a more deferential standard is warranted." (*Id.* at p. 516.)

With those principles in mind, we turn to the Counties' arguments.

II

*Climate Change*

A.      *The EIR's Climate Change Discussion*

The Counties first challenge DWR's discussion of climate change.  They contend DWR should have discussed climate change's potential effects on hydrologic conditions in the Feather River basin over the proposed 50-year licensing term, discussed how these potential effects could potentially alter project operations, and discussed how these potential alterations to project operations could potentially impact the environment.  We reject their argument.

DWR covered climate change and its potential impacts on project operations in its EIR.  Starting with a general discussion of climate change, DWR stated, among other things, that "most scientists agree that some warming has occurred over the past century" and that "[t]he United Nations Intergovernmental Panel on Climate Change [IPCC] predicts that changes in the Earth's climate will continue through the 21st century and that the rate of change may increase significantly in the future because of human activity."  Turning to climate change's potential impacts on project operations, DWR acknowledged that climate change could affect operations.  It stated, for example, that climate change could alter the timing of inflows into Lake Oroville.

But in the end, DWR found potential project operation changes necessitated by climate change too uncertain to evaluate.  Citing several different reports in the record, it noted that "there is a significant amount of uncertainty over the magnitude of climate change that will occur over this century" and "also uncertainty about changes in hydrologic conditions, aquatic ecosystems, and water demand that could occur as the result of various amounts of climate change."  It then wrote:  "Given the current quantitative uncertainties regarding climate change and its potential effects on California, particularly local effects of climate change and potential impacts on the Feather River watershed, any discussion of potential changes to operations of the Oroville Facilities

10

necessitated by climate change would be speculative at this time." DWR elsewhere in the EIR added that "no generally accepted standards exist regarding the assumptions required to model the effects of potential global climate change" and that "it would be speculative to further analyze potential future operations under purely hypothetical climate change scenarios beyond the current level of analysis."

The record supports DWR's findings. Consider, for instance, an article titled, "Climate Change Impacts Uncertainty for Water Resources in the San Joaquin River Basin, California" (Climate Change Impacts Uncertainty). The article's authors—a U.C. Berkeley engineering professor, two U.C. Berkeley scientists, a U.C. Berkeley post-doctoral researcher, and a water resources modeler with the United States Bureau of Reclamation—discussed two models simulating potential global and regional climate impacts. One model "suggests much wetter future conditions relative to present climate, whereas [the other model] suggests drier future conditions." Considering these "divergent and equiprobable" projections, the authors concluded that "[t]he range of possibilities suggested by these impacts is too vast to support selection of mitigation projects in current planning cycles." Complicating matters, the authors added that different regions could face very different impacts, as "it is well recognized that regional climate changes are expected to vary significantly as global climate change evolves."

DWR, in its 2005 report titled, "California Water Plan Update," offered similar conclusions. A publication included in the report stated: "[W]hile modeling of projected temperature changes is broadly consistent across most modeling efforts, there are disagreements about precipitation estimates. Considerable uncertainties about precise impacts of climate change on California hydrology and water resources will remain until we have more precise and consistent information about how precipitation patterns, timing, and intensity will change." Along the same lines, the publication further noted that "regional and local changes in hydrological conditions attributable to a greenhouse warming are uncertain." It added, commenting on California generally, that research

11

"suggests that there is a risk of increased flooding in California." But even then, it qualified its response, stating that "flooding depends not only on average precipitation but on the timing and intensity of precipitation—two characteristics not well modeled at present."

Later, in a 2006 report titled, "Progress on Incorporating Climate Change into Management of California's Water Resources" (Progress Report), DWR stated much of the same. It found that "[c]limate model projections for changes in total annual precipitation in California through the end of this century are mixed"—some predict moderate decreases in precipitation, others predict moderate increases in precipitation. It also found these models "generally not well suited for predicting regional changes in precipitation due to their coarse discretization compared to the scale of regionally-important factors that affect precipitation." And although DWR acknowledged "climate change could cause significant impacts on California's water resources and water demand," it ultimately found "uncertainty about the magnitude of climate change that will occur over this century," uncertainty in some cases about "the nature of future changes," and "uncertainty about changes in hydrologic conditions, aquatic ecosystems and water demand that could occur as the result of various amounts of climate change."

Considering these documented uncertainties at the time of the EIR, and particularly the uncertainties about local impacts in the Feather River basin, we find DWR reasonably concluded that "any discussion of potential changes to operations of the Oroville Facilities necessitated by climate change would be speculative at this time." We also find that, after reaching this conclusion, DWR had no need to pursue the matter further. As CEQA Guidelines section 15145 provides, "[i]f, after thorough investigation, a lead agency finds that a particular impact is too speculative for evaluation, the agency should note its conclusion and terminate discussion of the impact." DWR complied with this provision. (See *Citizens' Committee to Complete the Refuge v. City of Newark* (2021) 74 Cal.App.5th 460, 479 [a city did not need to evaluate its potential responses to

12

rising sea levels 50 to 80 years in the future, in part because "the range of projections for sea levels by that time are wide and sea levels at different ends of those projections could warrant significantly different responses"].)

None of this, however, is to say that DWR could reach this same conclusion today. As our Supreme Court has explained in a similar context, CEQA requires public agencies to ensure their analyses "stay in step with evolving scientific knowledge and state regulatory schemes." (*Cleveland National Forest Foundation*, *supra*, 3 Cal.5th at p. 504.) And so an agency's approach that is legally adequate at one point in time may not "necessarily be sufficient going forward." (*Ibid.*) But here, considering the information available at the time of the EIR in 2008, we find DWR reasonably concluded that the potential impacts were too speculative to warrant further evaluation. (See *Marin Mun. Water Dist. v. KG Land California Corp.* (1991) 235 Cal.App.3d 1652, 1662 [when the nature of future changes are "nonspecific and uncertain, an EIR need not engage in 'sheer speculation' as to future environmental consequences"]; cf. *Turtle Island Restoration Network v. U.S. Dept. of Commerce* (9th Cir. 2017) 878 F.3d 725, 740 (*Turtle Island*) [rejecting challenge to a federal agency's finding "that climate change effects could not be 'reliably quantified' nor 'qualitatively described or predicted' by the agency at the time"].)[2]

---

[2] SWC contends the Counties' argument also fails because "[a]n EIR is not required to analyze the potential future effects of climate change on the project." (See *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 387 [CEQA's "relevant provisions are best read to focus almost entirely on how projects affect the environment," not how the environment affects projects].) But as the Counties note, and as the trial court found, they are not merely arguing that DWR needed to consider climate change's effects on the project; they are instead arguing that DWR needed to consider the project's effects on the environment under future climate change conditions.

B.    *The Counties' Challenge to the EIR's Discussion*

Although the Counties challenge DWR's finding for various reasons, we find none of their arguments persuasive.

1.    *Reports Discussing Climate Change*

First, the Counties argue that DWR failed to disclose scientific authorities rejecting its findings on climate change.  They add that the propriety of this omission is a question of law subject to de novo review, not a question of fact subject to substantial evidence review.  But none of the Counties' cited authorities undermine DWR's conclusion.

One cited authority is a draft report from 2003.  As the Counties explain, the authors encouraged water managers to try to understand the potential consequences of climate change on water resources.  They reasoned that "reliance on the past record now may lead us to make incorrect—and potentially dangerous or expensive—decisions."  Another cited authority, DWR's 2005 California Water Plan Update, included a finalized version of the 2003 report and so stated the very same.  It also, as the Counties note, included an article from a DWR hydrologist who encouraged further evaluation of climate change's effects on precipitation.  He wrote that better modeling accounting for climate change "must be developed at the watershed level for a representative set of future scenarios," that this modeling "will require help from the research community," and that better hydrologic monitoring over "many years" would improve this modeling.[3]

---

[3]  The hydrologist added that some "[n]ew or upgraded temperature modeling is being developed as part of the Oroville power plant relicensing project."  But the record indicates that this new modeling had not yet been developed at the time of the EIR.  The EIR stated:  "Because only limited data and tools exist to provide answers to important questions for decision makers, water managers, and resource planners, DWR is working in conjunction with others to develop a new analytical approach for the preparation of the *California Water Plan 2010*."

14

But the Counties never acknowledge that both these authorities ultimately recognized significant uncertainties in this area. Both authorities stated: "Considerable uncertainties about precise impacts of climate change on California hydrology and water resources will remain until we have more precise and consistent information about how precipitation patterns, timing, and intensity will change. Some recent regional modeling efforts conducted for the western United States indicate that overall precipitation will increase . . . but considerable uncertainty remains due to differences among larger-scale [modeling efforts]." The cited DWR hydrologist added: "Regional precipitation predictions in the huge general circulation models of the atmosphere have not been reliable, and vary greatly among the different models. As a general rule, a warmer world would mean more evaporation, hence more precipitation overall. But where and when the precipitations falls is all-important."

Apart from failing to acknowledge these details, the Counties also mischaracterize DWR's 2005 California Water Plan Update. They characterize the report as stating that "the Oroville facilities *will* be able to generate less [hydro]power" because of climate change. (Italics added.) But it says no such thing. It instead explained that climate change could decrease hydropower generation under some scenarios but also could increase hydropower generation under other scenarios. It then noted that "[m]ore sophisticated studies . . . are necessary for California." Far from confirming the impacts the Counties envision, DWR's report instead emphasizes the uncertainties in this area.

The Counties' other cited authorities are also less helpful than the Counties believe. One, for instance, explained that a "[r]ecent scientific study suggests that projected climate changes would affect hydrologic conditions in the [Sacramento River and San Joaquin River basins]" and so recommended that water planners consider the ability to adapt to changing climate conditions. But this authority included only a one-paragraph discussion on climate change and noted that "specific estimates of these changes have not been quantified." Another cited authority—"From Climate-Change

15

Spaghetti to Climate-Change Distributions for 21st Century California" (Climate-Change Spaghetti)—stated that "the projected changes include sufficiently important near-term impacts, and the chances that projection uncertainties will decline precipitously in the near term are small enough, so that delays [in accounting for climate change] may not be warranted." But this authority, like the others, emphasized the uncertainties in this area, stating: "Projections of climate change due to increasing greenhouse-gas concentrations in the 21st Century are inevitably uncertain because of the chaotic nature of the global climate system, because of model imperfections, and because of uncertainties regarding what path mankind's emissions of greenhouse gases and other atmospheric contaminants will follow in the future."[4]

In sum, none of the Counties' cited authorities undermine DWR's finding of uncertainty. And while true that DWR did not discuss each of these authorities in its EIR, it still conveyed the same type of information. It generally acknowledged the potential impacts of climate change. It acknowledged its past reports discussing climate change and water management, including the 2005 California Water Plan Update and 2006 Progress Report. And it acknowledged that some commenters believed that "climate change is a reasonably foreseeable future condition that should be taken into account in the modeling done to simulate future Project operations." But again, consistent with expert findings in the record, DWR ultimately found that "any discussion of potential changes to operations of the Oroville Facilities necessitated by climate change would be speculative at this time."

---

[4] The Counties also cite a law review article prepared years after the EIR that argued agencies should not assume that past hydrologic variability is a good predictor of future hydrologic variability under a changing climate. But our focus is on the record at the time of the project, not extra record materials prepared after the project. (CEQA Guidelines, § 15162, subd. (c) ["Information appearing after an approval does not require reopening of that approval"].)

16

On this record, we are satisfied that the EIR " 'include[d] detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Cleveland National Forest Foundation*, *supra*, 3 Cal.5th at p. 511.) That was enough. The Counties may have preferred a longer discussion about the potential impacts of project changes caused by climate change, but the CEQA Guidelines favor a different approach, explaining: "If, after thorough investigation, a lead agency finds that a particular impact is too speculative for evaluation, the agency should note its conclusion and terminate discussion of the impact." (CEQA Guidelines, § 15145; see *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 411-412 ["An agency cannot be expected to predict . . . exactly what information scientific advances may ultimately reveal"]; *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 77, fn. 5 ["an impact statement prepared before reliable information is available would 'tend toward uninformative generalities' "].)

### 2. *Efforts to Quantify Climate Change Impacts*

Second, in a related argument, the Counties contend scientific authorities in the record show that climate change modeling is not speculative. They reason that various experts, including DWR in its 2006 Progress Report and those who authored the Climate Change Impacts Uncertainty article, used the same hydrologic modeling system that DWR used in the EIR here, "and modified some of the input data (reservoir inflows and hydrologic year types) to account for climate change." The Counties claim that these reports, and particularly the 2006 Progress Report, provide "everything that DWR would have needed to undertake the requisite climate change analysis for the Oroville Facilities."

Although both DWR in its 2006 Progress Report and the authors of the Climate Change Impacts Uncertainty article attempted to model climate change impacts, both still acknowledged various uncertainties that undermined the accuracy of their projections.

17

The authors of the Climate Change Impacts Uncertainty article, for example, explained that they used only two global climate models, not the 19 the IPCC referenced, and that their results "represent[ed] only a small portion of the climate change possibilities described in" a 2001 IPCC report, as they considered only one emissions scenario, not the many the IPCC described. They also noted other issues affecting the accuracy of their results. First, they explained that their modeling ignored future land use changes, which, they wrote, could "compound the impacts uncertainties already attributable to the $CO_2$ increase scenario, climate modeling approach, and other operations assumptions." Second, they suggested that their downscaling of the results from the two global climate models to the local level further "compounded" the "[u]ncertainties." Apart from those issues, moreover, the authors acknowledged the difficulty of using their modeling results in current planning cycles, as their modeling provided "divergent and equiprobable" projections.

DWR—which also used two climate change models in "an initial attempt" to quantify climate change impacts—acknowledged similar issues in its 2006 Progress Report. It stated: "All results presented in this report are preliminary, incorporate several assumptions, reflect a limited number of climate change scenarios, and do not address the likelihood of each scenario." DWR also noted that its models' precipitation predictions could not be considered reliable. It explained that "neither model accurately reproduces historical precipitation variability" and that, "[b]ecause of this, future variability represented by the model[s] can not be considered reliable." As covered earlier, moreover, DWR emphasized the uncertainties in predicting climate change's effects, particularly at the local level. It acknowledged "great uncertainty in the magnitude, timing, and location of precipitation and runoff changes associated with climate change"; acknowledged that different climate models reach conflicting results about changes in precipitation; and explained that these models are generally not well suited for predicting regional changes in precipitation.

18

The Counties never acknowledge these limitations when making their claims—which is arguably reason enough to reject their arguments.  (See *South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 330 [" 'appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking' "; " '[f]ailure to do so is fatal' "].)  Nor do they acknowledge that DWR, in its 2006 Progress Report, repeatedly cautioned that its modeling "results are not sufficient by themselves to make policy decisions"—which is far from the Counties' current claim that this report provided "everything that DWR would have needed to undertake the requisite climate change analysis for the Oroville Facilities."  Nor, lastly, do they acknowledge that DWR, in its EIR here, discussed the 2006 Progress Report and expressly noted its limitations, stating that the "report explicitly cautions" that " 'the results are not sufficient by themselves to make policy decisions' " and that "all results presented are 'preliminary, incorporate several assumptions, reflect a limited number of climate change scenarios, and do not address the likelihood of each scenario.' "

The Counties also cite another article, Climate-Change Spaghetti, which they assert shows DWR could have accurately accounted for climate change.  But this article too, which we briefly mentioned earlier, is less helpful than the Counties believe.  The author of the article noted that scientists often graph the predictions of multiple climate change models on a single graph, with different plotted lines representing the different modeled predictions over time.  But according to the author, a better approach would graph probability distributions, with different plotted lines representing "the probability of obtaining a given simulation of climate change" for a given year.  So, for instance, one plotted line might show that by 2025 two percent of climate models used simulated no temperature increase, 10 percent simulated an increase of one degree Celsius, one percent simulated an increase of three degrees Celsius, and so on.

19

None of this, however, meaningfully advances the Counties' position. While the author of this article favored consideration of climate change's potential impacts and believed his offered approach would better depict data from multiple climate change simulations, he still acknowledged the many uncertainties in this area. He stated, for example, that climate change projections are inevitably uncertain and that this uncertainty is unlikely to disappear any time soon. DWR even cited this conclusion in its EIR, stating that, "according to [the author of Climate-Change Spaghetti], it is unlikely that the level of uncertainty will diminish significantly in the foreseeable future."

In sum, the Counties' referenced materials tend to show that most scientists in 2008 believed that the global climate is changing and will continue to change because of past and future greenhouse gas emissions. They further show that several experts at that time believed steps should be taken in the near term to prepare for potential hydrologic changes attributable to climate change. But even so, at least at the time of the EIR, not even these experts believed that climate change's impacts on local hydrologic conditions could be accurately forecasted. As the trial court put it, "[i]t is a long step from the relatively generalized climate change data in the record to the project-specific forecasting demanded here, and [the Counties] have not carried their burden of showing that DWR could reasonably have taken this step."

### 3. DWR's Other EIRs

Third, the Counties contend the EIR failed to "disclose the department's own contemporaneous rejection in other major EIRs of sole reliance on twentieth-century hydrology." (Capitalization omitted.) But we find this argument too falls short.

Although neither of these referenced EIRs appears to be part of the record, DWR staff referred to them in internal e-mails. In one e-mail chain, a DWR employee described the climate change discussion in the "EIR/EIS for the Proposed Lower Yuba River Accord." Based on a "very quick[] look," the employee wrote, "it looks like they did some calculations to determine potential changes to inflow" from climate change and

20

found a potential 10 percent decrease in the "extreme case." But the Counties cite nothing to confirm that this initial read based on a "very quick[] look" was accurate. Nor have they shown that the referenced "extreme" projection was nonspeculative. And even setting all that aside, the Counties have not even shown that DWR played any role in preparing this document, and we decline to assume, as the Counties do, that it did. (See *Protect Our Water v. County of Merced* (2003) 110 Cal.App.4th 362, 364 ["if it is not in the record, it did not happen"].)

In another e-mail chain, a DWR employee wrote that DWR appeared to take inconsistent "approaches in the Monterey EIR and the Oroville EIR." The employee based his comment on a document that he attached to his e-mail, though it is unclear who prepared this document. The document explained that in the draft Oroville EIR—that is, the EIR here—DWR declined to adjust projected hydrologic conditions over the next 50 years to account for climate change. But according to the document, in the draft Monterey EIR, DWR concluded "that future water planning can no longer rely on historical hydrologic patterns alone, but must recognize potential changes, trends and future conditions expected as part of ongoing climate change in the State." According to the Counties, "it is impossible to reconcile these two perspectives."

But two considerations undermine the Counties' position. First, even in the Monterey EIR, as described in the attached document, DWR still struggled to predict the effects of climate change on hydrologic conditions. DWR purportedly found there could be an increase of up to 10 percent in the long-term average of SWP supplies to SWP contractors because of climate change. But it also purportedly found there could instead be a decrease of up to 10 percent in these supplies. And no scenario, as far as we can tell, was more likely than the other. We are left, then, with a conclusion not altogether different than DWR's conclusion here that climate change's effects on hydrologic conditions, particularly at the local level, are uncertain.

21

Second, and more importantly, the Counties' failure to provide any description of the Monterey project makes it difficult to compare these two EIRs. As other cases demonstrate, agencies can reach different conclusions about the foreseeability of climate change impacts in different contexts. (Compare *Turtle Island, supra*, 878 F.3d at p. 740 [accepting agency's finding, in an opinion involving certain turtle species, that climate change effects could not be reasonably determined] with *Alaska Oil & Gas Assn. v. Jewell* (9th Cir. 2016) 815 F.3d 544, 558-559 [accepting agency's finding, in an opinion involving polar bears, that climate change effects could be reasonably determined].) So while DWR might have thought it best to account for climate change effects in the Monterey EIR, that does not necessarily show that DWR's approach here was altogether inconsistent. Lacking little detail about the substance of the Monterey EIR, we are unpersuaded that DWR's failure to discuss this separate EIR requires reversal.

### 4. Federal Case Law

Fourth, the Counties contend DWR's conclusion is inconsistent with federal case law discussing climate change, including *Natural Resources Defense Council v. Kempthorne* (E.D.Cal. 2007) 506 F.Supp.2d 322 (*NRDC*), *Pacific Coast Federation of Fishermen's v. Gutierrez* (E.D.Cal. 2008) 606 F.Supp.2d 1122 (*Pacific Coast*), *Appalachian Voices v. U.S. Department of Interior* (4th Cir. 2022) 25 F.4th 259, *Wild Fish Conservancy v. Irving* (E.D.Wn. 2016) 221 F.Supp.3d 1224, and *AquAlliance v. U.S. Bureau of Reclamation* (E.D.Cal. 2018) 287 F.Supp.3d 969. But in each of these cases, a federal agency largely ignored data on climate change.

In *NRDC*, for instance, the district court indicated that a federal agency might be able to "rationally discount[]" information on climate change's potential effect on precipitation "because of its inconclusive nature." (*NRDC, supra*, 506 F.Supp.2d at p. 369.) But because the agency before it never meaningfully discussed the topic, the court found it "impossible to determine whether the information was rationally discounted because of its inconclusive nature, or arbitrarily ignored." (*Ibid.*, fn. omitted.) In *Pacific*

22

*Coast*, similarly, the same district court faulted a federal agency for its "total failure to address, adequately explain, and analyze the effects of global climate change on the species." (*Pacific Coast, supra*, 606 F.Supp.2d at p. 1184.)

The remaining cited cases are similar. In *Appalachian Voices v. U.S. Department of Interior, supra*, 25 F.4th 259, the Fourth Circuit found an agency's single sentence on climate change insufficient, particularly since the agency "never mention[ed] climate change in connection" with an endangered species, even "though other documents in the record suggest[ed] climate change poses a 'persistent threat' to the" species. (*Id.* at pp. 276-277.) In *Wild Fish Conservancy v. Irving, supra*, 221 F.Supp.3d 1224, the district court faulted an agency for relying on recent historical streamflow data for modeling without any "discussion whatsoever of the potential effects of climate change." (*Id.* at p. 1233.) The court added that the agency "does not necessarily need to conduct a study or build a model addressing the impacts of climate change," but it at least must consider the best available science on the topic. (*Id.* at p. 1234.) Lastly, in *AquAlliance v. U.S. Bureau of Reclamation, supra*, 287 F.Supp.3d 969, the court described the same general type of problem identified in *Wild Fish Conservancy*—the agency failed to consider the best available data on climate change. (*Id.* at pp. 1031-1032.)

The Counties, however, have not shown that the EIR here suffers from these same shortcomings. They never show that DWR failed to consider the best available data on climate change at the time of the EIR. Nor have they shown that DWR failed to rationally explain its decision. And to the extent the Counties read these decisions to forbid an agency from finding some climate change impacts too speculative to evaluate, they are wrong. The *NRDC* court, as covered, indicated a federal agency might be able to "rationally discount[]" information on climate change "because of its inconclusive nature." (*NRDC, supra*, 506 F.Supp.2d at p. 369.) And since then, the Ninth Circuit in *Turtle Island* accepted a federal agency's 2012 finding that some climate change impacts are too speculative to evaluate.

In *Turtle Island*, a federal agency considered the potential effects of climate change on certain turtle species protected under the Endangered Species Act. (*Turtle Island, supra*, 878 F.3d at p. 740.) But the agency ultimately, in a 2012 opinion, "determined that there was no available data from which it could credibly project the impacts that climate change would have on . . . turtle survival rates." (*Ibid.*) It explained, among other things, that "the effects of climate change will not be globally uniform, and the uncertainty of the rate, magnitude, and distribution of such effects on different temporal and spatial scales—not to mention the turtles' ability to adapt to these effects— have not been comprehensively studied." (*Ibid.*) The agency thus "decided that climate change effects could not be 'reliably quantified' nor 'qualitatively described or predicted' by the agency at the time." (*Ibid.*) Although several parties believed this discussion inadequate, the Ninth Circuit rejected their challenge. It found the "[p]laintiffs have failed to sufficiently refute the [agency's] stated inability to offer more specific predictions on the effects of climate change, and they have not alleged that less speculative scientific information is available that the agency overlooked." (*Ibid.*)

Considering all these federal authorities, we find *Turtle Island*—not the Counties' cited authorities—most relevant here. Similar to the Ninth Circuit in *Turtle Island*, we find the Counties have neither refuted DWR's stated inability to offer more specific predictions on climate change, nor shown that less speculative scientific information was available that DWR overlooked.

### 5. *California Case Law*

Lastly, on the topic of climate change, the Counties contend DWR's conclusion is inconsistent with California case law—namely, our court's decision in *Voices for Rural Living v. El Dorado Irrigation Dist.* (2012) 209 Cal.App.4th 1096. That case involved a challenge to an irrigation district's claimed exemption from CEQA for its decision to provide water to a casino. (*Id.* at p. 1100.) In evaluating the applicability of the claimed exemption, we considered whether there was "substantial evidence of a reasonable

24

possibility that increasing the delivery of [the district's] water to [the casino] may have a significant effect on the environment." (*Id.* at p. 1110.) We found there was, reasoning that a scientific analysis in the record showed that, with climate change, a future drought plausibly could cause these deliveries to have a significant effect—an issue that the irrigation district never considered. (*Id.* at p. 1112.) For that reason, we rejected the district's claim that its project was exempt from CEQA. (*Id.* at p. 1113.)

But this case is both factually and legally different. It is factually different because while the irrigation district in *Voices for Rural Living* ignored climate change, DWR did not do the same here. It is also legally different because of the very different standard of review it applied. In cases comparable to *Voices for Rural Living*, a lead agency's decision will be set aside if substantial evidence exists that the project would have a significant effect on the environment—even if substantial evidence also supports the lead agency's contrary finding that the project would not have a significant effect on the environment. (*Voices for Rural Living v. El Dorado Irrigation Dist., supra*, 209 Cal.App.4th at p. 1108.) But in cases challenging an EIR, the standard is far more deferential. An EIR, for example, may not be set aside simply because an opposite factual finding " ' "would have been equally or more reasonable," for, on factual questions, our task is "not to weigh conflicting evidence and determine who has the better argument." ' " (*Sierra Club, supra*, 6 Cal.5th at p. 512.) Because we find *Voices for Rural Living* inapposite for these reasons, we reject the Counties' reliance on it.[5]

---

[5] Because we reject the Counties' challenge to DWR's finding that "any discussion of potential changes to operations of the Oroville Facilities necessitated by climate change would be speculative at this time," we also reject their related challenge to DWR's refusal to consider alternatives and mitigation measures concerning these potential changes.

25

III

*Historical Hydrologic Conditions*

The Counties next contend DWR failed to model project operations using the full range of 20th-century hydrologic conditions—an issue they first raised in their reply brief in the trial court.  They state that the EIR noted historical annual flows as low as 994,460 acre-feet in 1977 and as high as 9,492,400 acre-feet in 1907, but it then only purported to model project performance using data from 1922 to 1994—a timeframe that improperly omitted the historical high flow in 1907.  They further argue that the EIR "apparently also excluded analysis of the twentieth century's historical low flow of 1977—994,460 acre-feet."  Lastly, they assert that DWR, rather than model project operations using actual historical flow data, wrongly modeled project operations using hypothetical flow data under a fictitious scenario that included no upstream storage or diversion operations.  We reject their arguments.

We start with DWR's alleged failure to include the historical low flow of 1977 in its modeling.  Portions of the EIR, it is true, suggest that DWR excluded that year's data from its modeling.  The final EIR, for instance, said the measures in the settlement agreement "were all developed and formulated to be effective under an extremely broad hydrologic range (1.7-10 million acre-feet of annual inflow to Lake Oroville)."  But as the Counties point out, the low flow in 1977 was well below 1.7 million acre-feet.  And as the Counties also point out, the EIR elsewhere characterized the range of 1.7 to 10 million acre-feet as the range from 1979 to 1999.

But even so, consideration of the whole of the EIR shows that DWR accounted for 1977 in its modeling.  The EIR explained:  "Extensive operations modeling performed in support of both the Preliminary Draft Environmental Assessment (PDEA) and subsequent [draft ]EIR . . . analyz[ed] 73 different inflow years into Lake Oroville."  The EIR elsewhere explained that DWR analyzed these 73 different inflow years using historical

26

data—namely, the data from 1922 to 1994—and the record includes the EIR's modeling results for this timeframe.

While the Counties maintain that DWR's own staff e-mails show that DWR excluded the 1977 water year from its analysis, we find their reliance on these e-mails misplaced. In one e-mail, a DWR staff member e-mailed a consultant about the cited range of 1.7 to 10 million acre-feet. He wrote: "The text originally said this was from 1979-2000, but shouldn't we be citing the longer . . . 74 year data set?" In a separate e-mail, another employee asked whether DWR should "cite the 1.7 [million acre-feet] to 10 [million acre-feet] annual inflow range modeled" when discussing the range of inflows already modeled. And in an attachment to a third e-mail, DWR staff stated that DWR modeled project operations using a range of "1.7 [million acre-feet] to 10 [million acre-feet] of annual inflow to Lake Oroville."

But while these e-mails perhaps show some confusion about the relevant figures for the 73-year data set—that is, the data set covering 1922 to 1994—they do not show that DWR failed to conduct modeling for these years. Again, the record confirms that DWR used these 73 different inflow years for its modeling. And while the Counties' citations to a few internal e-mails may raise questions when considered alone, we cannot ignore, as the Counties have, DWR's actual modeling results covering 1922 to 1994.

We turn next to DWR's alleged failure to include the historical high flow in 1907 in its modeling. Although it appears true that DWR did not account for this year in its modeling, the Counties never explain why that was a fatal flaw considering the whole of the EIR's findings. According to the EIR, "the current calculated [probably maximum flood] peak inflow to Lake Oroville is more than double the highest recorded historic flow on the Feather River." The EIR further indicated that the highest recorded historic flow was 10 million acre-feet—which is even above the high flow in 1907. The EIR, then, may not have included data from 1907 in its modeling, but it still explained why the Oroville Facilities could withstand flows comparable to (and even far higher than) those

27

in 1907. The Counties never explain why this reasoning was flawed. Nor have they shown that more modeling was necessary under these circumstances.

The Counties' argument, moreover, suffers from a more fundamental defect: They have not shown that they, or any other commenter, even raised this issue in the administrative proceedings. Under CEQA's exhaustion requirement, a person cannot challenge a CEQA decision in court on an alleged ground that was never presented to the public agency in the administrative proceedings. (Pub. Resources Code, § 21177, subd. (a); see also *Save the Hill Group v. City of Livermore* (2022) 76 Cal.App.5th 1092, 1104 [" ' "to attack a decision that is subject to CEQA, the alleged grounds for noncompliance must have been presented to the public agency" ' " with " ' "sufficient[] specific[ity] so that the agency has the opportunity to evaluate and respond" ' "].) This requirement is known as the exhaustion doctrine and serves " ' " 'to lighten the burden of overworked courts in cases where administrative remedies are available and are as likely as the judicial remedy to provide the wanted relief.' " ' " (*Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 291.)

In this case, no public commenter in the administrative proceedings, as far as we can find, raised the Counties' current claim that DWR should have modeled project operations using a historical data set broader than the 1922-1994 data set. Although the Counties cite over 70 pages in the record that they claim show otherwise, we find nothing in these pages helpful. Many of the Counties' cited pages discuss topics having nothing to do with the range of hydrologic conditions, including mercury levels and meadow restoration projects. And while some of the cited pages have some connection to the range of hydrologic conditions—including those pages asking DWR to consider climate change's effects on future hydrologic conditions—they do not fairly apprise DWR of its alleged failure to use a historical data set broader than the 1922-1994 data set. Because no commenter properly raised this issue in the administrative proceedings, the Counties cannot raise the issue now. (Pub. Resources Code, § 21177, subd. (a).)

28

Lastly, we turn to the Counties' concern that DWR modeled project operations using hypothetical flow data rather than actual historical flow data. The Counties base their point on a single sentence in the EIR referencing unimpaired, rather than impaired, flows. We find their concern unfounded. The record shows that DWR modeled based on 73 years of historical data—not 73 years of hypothetical data.

IV

*Local Impacts*

Next, the Counties contend DWR failed to properly evaluate and mitigate two types of local impacts: (1) fiscal impacts to Butte County from increased demand for public services, and (2) public health impacts from mercury and bacteria in the waters of the Oroville Facilities. We reject both arguments.

A.    *Fiscal Impacts*

We start with the alleged fiscal impacts.

An agency's EIR must, as relevant here, describe "[a]ll significant effects on the environment of the proposed project." (Pub. Resources Code, § 21100, subd. (b)(1).) Under this requirement, an agency must consider the economic effect of a project if the effect contributes to, or is caused by, a physical change in the environment. (CEQA Guidelines, § 15064, subd. (e).) To give an example of an application of this rule, the court in *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151 found a county needed to consider whether a shopping center, in potentially leading to the closure of competing businesses in a downtown area, could cause "physical deterioration of the downtown area." (*Id.* at pp. 170-171.)

An agency, however, need not discuss economic effects lacking the requisite connection to a physical change in the environment, for an economic effect in itself is not a significant effect on the environment. (CEQA Guidelines, §§ 15064, subd. (e) ["Economic and social changes resulting from a project shall not be treated as significant effects on the environment"], 15131, subd. (a) [same].) As one court has put it in

29

describing this rule, "CEQA is not an economic protection statute." (*Porterville Citizens for Responsible Hillside Development v. City of Porterville* (2007) 157 Cal.App.4th 885, 903 [city did not need to consider whether a proposed project would lower neighboring housing values].)

Here, the Counties assert that "DWR's EIR lacks any quantitative analysis of the costs that Butte County will incur to accommodate the project's environmental impacts." They then state that these costs will arise from increased demand for public services, like law enforcement. But as both DWR and SWC point out, the Counties fail to demonstrate how these fiscal impacts are linked to physical changes in the environment—even though the trial court rejected their claim for this very reason.

Although the Counties offer two general arguments to establish this link, we find neither argument persuasive. They first vaguely assert that these fiscal impacts are tied to "the project's environmental impacts." But we find that claim too vague to meaningfully evaluate and insufficient to establish a link to a physical change. They next challenge DWR's finding that the project would not trigger the need for new or expanded government facilities to provide public services. DWR reasoned that was so after "[c]onsidering the small and gradual increase in the demand for public services that would be generated by implementing the Proposed Project, and the distribution of law enforcement, fire, and emergency medical services calls among several agencies." Challenging this finding, the Counties assert that DWR's own consultant "found annual capital improvement costs of $18,500" for Butte County and further found the net cost to Butte County from increased demand for public services generated by the project would be $386,900 per year.

But we read the consultant's findings differently. First, the consultant never said the $386,900 figure represented the costs attributable to the increased demand for public services generated by the project. It instead said this figure represented Butte County's net cost of providing public services to visitors of the Oroville Facilities for fiscal year

30

2002-2003. This figure, then, represented the cost attributable to providing public services under existing conditions, not the cost attributable to the increased demand for public services that would result from the project. This figure, moreover, was relatively small according to the consultant's calculations, representing only "about 0.1 percent of the County's overall budget." Second, the consultant never claimed, as the Counties appear to believe in citing the capital improvement costs, that the project would require Butte County to alter or construct new facilities. The consultant instead accepted Butte County's contention that it would need to replace and upgrade certain facilities and then calculated capital improvement costs based on that assumption. That the consultant assumed the county would need to replace and upgrade certain facilities does not undermine DWR's finding that the project would not trigger these changes.

Left without any demonstrated link to a physical change, we must reject the Counties' claim that DWR needed to quantify the potential fiscal impacts to Butte County. While the project may increase demand for public services in Butte County, that in itself "is not an *environmental* impact that CEQA requires a project proponent to mitigate." (*City of Hayward v. Trustees of California State University* (2015) 242 Cal.App.4th 833, 843 ["The need for additional fire protection services is not an *environmental* impact that CEQA requires a project proponent to mitigate"].)[6]

_____

[6] In a footnote—one of 90 substantive footnotes in their opening brief—the Counties discuss existing problems in the project area involving illegal dumping, vandalism, and other issues. But the Counties never explain the import of these existing impacts to its argument about the project's impacts. In any event, we decline to consider arguments developed in footnotes. (*Holden v. City of San Diego* (2019) 43 Cal.App.5th 404, 419-420 (*Holden*) [courts need not address arguments made in footnotes].)

31

B.      *Health Impacts*

We turn next to the alleged public health impacts from mercury and bacteria.

Starting with mercury, the Counties contend the EIR failed to adequately evaluate the health impacts to those who consume fish with high mercury levels. As the Counties note, the EIR explained that some fish in the Feather River are high in mercury and that the existing Oroville Facilities increase sportfishing opportunities in the Feather River. According to the Counties, the EIR should have evaluated who consumes this fish, what quantities they consume, and whether they consume fish with high mercury levels from restaurants, grocery stores, and other commercial sources. They further contend the EIR should have discussed potential "subtle effects" from consuming too much fish with high mercury levels, should have acknowledged that the Oroville Facilities created the conditions that led to bioaccumulation of mercury in fish, and should have noted that women of childbearing age and children should limit their consumption of high-mercury fish.

We reject their argument. The EIR, in its discussion of the environmental setting, explained that the presence of mercury in the project area is nothing new. Mercury is an existing issue, with "[h]istorical gold mining practices upstream of the project area, as well as the development of municipal and industrial land uses in the upper watershed and along the lower Feather River," being the primary sources of the mercury. The EIR also explained how the existing Oroville Facilities affect mercury concentrations in fish. These facilities—although they do not themselves contribute mercury—trap mercury-laden sediments from other sources and "[b]iomagnification apparently has resulted in elevated mercury levels in fish from all project waters."

But after documenting these existing issues, the EIR stated that the Office of Environmental Health Hazard Assessment (OEHHA)—a department charged with evaluating health risks from chemical contaminants (see *Environmental Health Advocates, Inc. v. Sream, Inc.* (2022) 83 Cal.App.5th 721, 726)—"indicates that there

32

have been no recorded incidences of mercury-related health effects from consumption of sport fish in California" and "has stated that there is a low potential health risk from consuming California sport fish from water bodies subject to fish advisories,[7] unless the consumption rate is considerably higher than recommended."  The EIR further explained that neither the proposed project nor any project alternative "would result in a change to either the rate or the amount of mercury accumulation within the FERC Project boundary."  It added that the proposed project would "include measures to educate and notify the public of safe limits on the consumption of fish," including by requiring DWR to "post notices at all boat ramps and any other location specified by OEHHA within the FERC Project boundary about health issues associated with consuming fish taken from within FERC Project waters."

Under these circumstances, we reject the Counties' claim that the EIR's discussion was inadequate.  Although the EIR would have been even more thorough had DWR surveyed all those who fish in the project area, learned of their diets, and quantified the amount of mercury in their diets, the Counties have not shown that this step was necessary in this case.  As our Supreme Court has explained, "[a] project opponent or reviewing court can always imagine some additional study or analysis that might provide helpful information."  (*Laurel Heights Improvement Assn. v. Regents of University of California, supra*, 47 Cal.3d at p. 415.)  But "[i]t is not for them to design the EIR" and "[t]hat further study . . . might be helpful does not make it necessary."  (*Ibid.*; see also

---

**7**  At the time of the EIR, the project area was not subject to a fish advisory for mercury, though OEHHA had prepared a draft consumption advisory for mercury in fish from the lower Feather River in Butte, Yuba, and Sutter Counties.

*Watsonville Pilots Assn. v. City of Watsonville* (2010) 183 Cal.App.4th 1059, 1094 [EIR did not need to identify solutions to preexisting groundwater overdraft conditions].)[8]

Moving on to bacteria, the Counties contend the EIR avoided evaluating potential impacts from " 'high bacterial counts,' likely due to human and wildlife fecal waste, during seasonal peaks in recreation and wildlife activity." The EIR, however, did evaluate these potential impacts. It explained that fecal coliform bacteria levels at several recreation areas occasionally exceeded a state agency's "draft guidance for freshwater beaches." The EIR attributed these exceedances to recreational users and waterfowl, explaining that large amounts of waterfowl visit the area and "discharge fecal wastes" in the water or nearby drainage ways. But the EIR ultimately found these occasional exceedances less than significant because a project condition "would develop a monitoring and public education program related to bacteria, contact recreation, and public noticing of conditions."

The Counties' remaining challenges to the EIR's bacteria discussion are also unpersuasive. First, they assert the EIR "includes inconsistent statements about project impacts on bacteria levels." But they never describe these alleged inconsistencies. Second, they suggest DWR's planned monitoring cannot reduce the potential impact from high bacteria levels, because DWR might have performed monitoring even absent the project. But even if true that DWR would have monitored bacteria even without the project, the Counties never explain how this undermines DWR's finding of no significant

---

[8] The Counties also offer new arguments in their reply brief. Rather than focus on DWR's alleged failure to discuss existing mercury issues, as they did in their opening brief, they contend DWR failed to discuss "the project's attraction of new visitors" who will now be exposed to mercury. They further argue that DWR "ignore[d] that climate change is likely to exacerbate the Oroville Facilities' impacts on toxic contamination." We decline, however, to address these belatedly raised arguments. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [courts need not address contentions made for the first time in a reply brief without good cause].)

impact. Third, the Counties suggest DWR should have studied the potential effectiveness of its plan to provide public notice of high bacteria levels. But the Counties provide neither an explanation nor any authority on why a study was required here. Fourth, the Counties claim DWR "ignore[d] more effective mitigation measures, such as closing recreation areas and intercepting bacterial contaminants . . . before they reach the water." But the Counties supply no evidence showing these proposed measures would be more effective, nor do they show that these measures were even proposed. And fifth, the Counties suggest that DWR has relied on deferred mitigation because the settlement agreement "establishes that DWR *may* develop a public education program if it determines that one 'is needed.' " But the Counties' argument is premised on a misreading of the settlement agreement. The agreement states that DWR "*shall* determine if a public education program is needed" in consultation with several agencies, and, if the answer is yes, it then "*shall* develop the public education program in consultation with the above agencies." (Italics added.)

V

*Water Quality and Beneficial Use*

The Counties next, for five reasons, challenge DWR's discussion of water quality and designated beneficial uses within the project area.

Before turning to the Counties' contentions, we start with a little background on water quality and beneficial uses. State law establishes a goal of "attain[ing] the highest water quality which is reasonable, considering all demands being made and to be made on those waters and the total values involved, beneficial and detrimental, economic and social, tangible and intangible." (Wat. Code, § 13000.) To help achieve this goal, California's nine regional water quality boards are charged with developing regional water quality control plans, called "basin plans," that must describe beneficial uses to be protected, water quality objectives, and a program to achieve these water quality

35

objectives. (*City of Burbank v. State Water Resources Control Bd.* (2005) 35 Cal.4th 613, 619; see Wat. Code, §§ 13050, subd. (j), 13240.)

The basin plan covering the Feather River, including Lake Oroville, is called the Water Quality Control Plan for the Sacramento and San Joaquin River Basins (the Basin Plan). It describes beneficial uses for Lake Oroville, including municipal and domestic water supply, irrigation, power generation, contact and noncontact recreation, warm water and cold water habitat, warm water and cold water spawning habitat, and wildlife habitat. It also describes water quality objectives for this area, including, among others, objectives for temperature, metals, and pH.

A.      *Project Objectives*

Challenging the EIR's discussion of these topics, the Counties first focus on the EIR's statement of project objectives.

Under CEQA, "[t]he statement of objectives should include the underlying purpose of the project and may discuss the project benefits." (CEQA Guidelines, § 15124, subd. (b).) In this case, the EIR explained that the project's objective "is the continued operation and maintenance of the Oroville Facilities for electric power generation, including implementation of any terms and conditions to be considered for inclusion in a new FERC hydroelectric license."

The Counties challenge this stated objective for several reasons. They first claim this objective wrongly "exclude[d] any serious consideration of how the project will operate, or might operate differently, in the next half-century." But because they never explain why that is so, we reject their unexplained argument. (See *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 (*Badie*) ["When an appellant . . . asserts [a point] but fails to support it with reasoned argument and citations to authority, we treat the point as waived"]; *Chico Advocates for a Responsible Economy v. City of Chico* (2019) 40 Cal.App.5th 839, 846 ["an EIR approved by a governmental agency is presumed legally adequate, and the party challenging the EIR has the burden of showing

36

otherwise"].)  The Counties further claim the EIR's stated objective wrongly "assume[d] that project conditions are sufficiently rigorous to meet [existing] 'commitments,' " including commitments for environmental protection.  But stating that the objective "is the continued operation and maintenance of the Oroville Facilities for electric power generation," along with implementation of any new FERC license terms, evidences no such assumption.

B.    *Environmental Setting*

The Counties next contend the EIR's discussion of the environmental setting wrongly assumed that current operations comply with water quality standards.  (See CEQA Guidelines, § 15125, subd. (a) [an EIR must include a description of a project's environmental setting].)  They reason that is so for three general reasons.

Their first argument concerns DWR's use of qualifiers in the EIR.  They argue DWR, by using qualifiers, mischaracterized the Basin Plan's objectives as aspirational rather than mandatory targets, including when DWR explained that "the operation of the Oroville facilities must *reasonably* comply with the [Basin Plan]."  (Italics added.)  The Counties further argue DWR hid past exceedances through the use of qualifiers, including when it stated that flows and temperatures "*generally* support[]" the spawning of certain fish species, that the Oroville Facilities "*reasonably* protect" certain wildlife habitat, and that reservoir drawdown during "*normal* operations" can affect beach access and black bass nest survival.  (Italics added.)

We find differently.  Although DWR at times used unnecessary qualifiers, including when it said it must "reasonably comply" with the Basin Plan, it still made clear that compliance was necessary.  It explained, for instance, that before FERC issues a new license, the State Water Resources Control Board (the Water Board) must find "that the project complies with appropriate requirements of the . . . Basin Plan, which includes the water quality objectives for protection of designated beneficial uses."  And although DWR also used qualifiers when describing past compliance with the Basin Plan,

37

including when it said temperatures "generally comply" with applicable water quality criteria, the Counties have not shown that it hid exceedances. The EIR, in fact, explicitly disclosed that "temperature exceedances do occur."

The Counties next contend DWR failed to disclose certain past exceedances of water quality standards. They assert DWR "fail[ed] to specify which metals other than mercury exceeded water quality standards within the project area, avoid[ed] mentioning what percentage of samples exceeded a given standard, and d[id] not disclose the potential risks associated with these violations." The Counties also assert DWR misleadingly wrote that phosphorus concentrations did not exceed Basin Plan criteria objectives, even though its "own separate study flatly rejects this assertion, noting that the phosphorous standard 'has been exceeded numerous times at all sampling sites.' "

We find neither point persuasive. In terms of metals, the Counties suggest that the EIR described exceedances for metals other than mercury, but then declined to disclose these other metals. But the Counties never reveal where this occurred. In terms of phosphorus, the Counties mischaracterize the record in claiming that it shows exceedances of Basin Plan objectives. While the record reveals exceedances of the federal Environmental Protection Agency's recommendations for phosphorus, it does not show exceedances of Basin Plan objectives for phosphorus.

Lastly, the Counties contend the EIR failed to adequately discuss potential impacts to beneficial uses. They assert the EIR documented "specific failures" that affect various beneficial uses, but it improperly dismissed these issues without proper analysis. They further assert the EIR acknowledged project operations could increase water temperatures in the "Diversion Pool" and one other area (which the Counties do not identify), but the EIR then failed to address "what happens when the hatchery does not achieve water temperature requirements." Both the referenced Diversion Pool and fish hatchery are part of the Oroville Facilities.

But although the Counties fault DWR for failing to sufficiently evaluate documented "specific failures," they never identify these alleged failures. And although the Counties further fault DWR for failing to sufficiently discuss the impacts from high water temperatures in the fish hatchery, their argument is premised on a misreading of the record. The Counties' record citations discuss potential elevated water temperatures in two areas: the Diversion Pool and the lower Feather River below the Thermalito Afterbay Outlet. The Counties then suggest that the Diversion Pool, the river below the Thermalito Afterbay Outlet, and the fish hatchery are all the same, and so high temperatures in one means high temperatures in all three. But that is not true. The Diversion Pool, the lower Feather River below the Thermalito Afterbay Outlet, and the fish hatchery are all in distinct locations, as the EIR shows. Apart from failing to acknowledge these different locations, moreover, the Counties never attempt to explain how warmer waters in one area could lead to warmer waters in another area. None of the Counties' arguments, then, demonstrate that DWR simply assumed compliance with water quality standards.[9]

C.      *No-Project Alternative*

The Counties next challenge concerns the EIR's discussion of project alternatives. An EIR must identify and discuss a range of alternatives to the proposed project, including a no-project alternative. (CEQA Guidelines, § 15126.6, subds. (a), (e)(1).) Challenging DWR's compliance with this requirement, the Counties contend the EIR's no-project alternative wrongly assumed future compliance with water quality standards and beneficial use requirements.

---

[9] The Counties also claim in a footnote that the EIR's discussion of elevated bacteria levels was lacking. But again, we will not consider arguments developed in footnotes. (See *Holden, supra*, 43 Cal.App.5th at pp. 419-420.)

In support, they first argue: "Rather than assessing whether the no project alternative would actually protect beneficial uses, DWR assume[d] that '[w]ith implementation of the No-Project Alternative, baseline conditions identified . . . would continue into the future.' " The Counties, however, misrepresent the record. Although true that DWR said "baseline conditions . . . would continue into the future," the text omitted with the ellipsis is significant. It shows that DWR was only discussing the "baseline conditions identified in Section 4.1.2," which was a section discussing project geology, including the types of rocks underlying the project area—not a section focused on water quality and beneficial uses.

The Counties' next argument concerns DWR's response to a Water Board comment. The board commented that the draft EIR had conflicting findings about water temperatures—in one part it said water temperatures generally comply with the criteria established for the "Feather River Hatchery and Robinson Riffle," but in another part it said pre-spawning adult salmonids may be exposed to elevated water temperatures. Focusing on a portion of DWR's response to this comment, the Counties contend DWR improperly cited a study that discussed the effects of water temperatures. They reason that an EIR "analyzes impacts and does not relegate decision makers or the public to separate, unreviewed studies."

But the Counties' argument supposes that DWR did little more than cite a study in response to the Water Board's comment. That is not true. Apart from citing the study, DWR directly responded to the Water Board's concerns. It explained that while pre-spawning adult salmonids may be exposed to elevated water temperatures "in the lower portion of the River as water moves downstream," the "water temperature compliance point" is located upstream of that portion of the river. And so, DWR indicated, it is not inconsistent to say both that water temperatures generally comply with established criteria in this area and that pre-spawning adult salmonids further downstream may be exposed to elevated water temperatures. The Counties never explain why DWR's

40

explanation—which they never acknowledge—was flawed. Nor have they shown that DWR violated CEQA merely by citing a study in the record. (See *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 902 [in response to comments on an EIR, a lead agency may list the specific documents it believes support its findings—at least when its response requires no burdensome sifting or hunting].)

The Counties also argue that DWR failed to address its own prediction that water demand would rise, "assumed that no foreseeable changes in operation from changes in climate or in SWP and Central Valley Project management would impact the Oroville Facilities' ability to meet beneficial uses," and "assumed that no aspect of the current operations could be slowly decreasing in effectiveness." But the Counties cite nothing in the record showing DWR predicted increased water demand, nor do they cite anything in the record showing DWR's alleged assumptions.[10] We will disregard these unsupported claims. (Cal. Rules of Court, rule 8.204(a)(1)(C) [each brief must "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears"]; *Jumaane v. City of Los Angeles* (2015) 241 Cal.App.4th 1390, 1406 [courts "may disregard any claims when no reference [to the record] is furnished"].)

D. *Compliance With Water Quality Standards*

The Counties next contend the "EIR's wrongful assertion of existing compliance allowed DWR to evade proof that future project operations will protect water quality and beneficial uses." (Capitalization omitted.) But the Counties never establish their premise that the EIR simply asserted existing compliance.

Attempting to establish this premise, the Counties state: DWR "repeatedly asserts that the proposed project measures meet beneficial uses because they are 'more protective

---

[10] Although the Counties elsewhere challenge DWR's evaluation of climate change, we reject their arguments for reasons already covered.

and [enhance] water quality beneficial uses and aquatic resources.' " The Counties then contend being more protective means little and "does not equate to basin plan compliance." But the Counties misread the record. At the cited page of the record, DWR did not claim that the proposed project measures would satisfy Basin Plan requirements simply because they would be "more protective" than existing measures. It instead said the "Proposed Project, when compared to the PDEA Proposed Action, is more protective and enhances water quality beneficial uses and aquatic resources."

The Counties also assert: "DWR presumes that '[a]ll programs described in the Proposed Project would be implemented to continue and enhance the reasonable protection of the designated beneficial uses in the [Basin Plan].' " But while the quoted text implies that existing operations are reasonably protective of the designated beneficial uses in the Basin Plan, it does not presume, as the Counties believe, that existing operations are always compliant with Basin Plan requirements. Again, the EIR expressly disclosed that exceedances of Basin Plan standards have occurred.

E.    *Mitigation Measures and Alternatives*

Lastly on the topics of water quality and beneficial uses, the Counties contend DWR needed to consider mitigation measures and alternatives to address certain impacts. They raise three points in support.

First, the Counties claim "DWR failed to acknowledge that the California Water Plan Update 2005 predicts formidable challenges to meeting beneficial use objectives in the future." But they never describe these predicted "formidable challenges." As best we can tell after reviewing their record citation, the Counties are alluding to climate change. But as already discussed, we find the Counties' challenge to DWR's climate change discussion unpersuasive.

Second, the Counties assert DWR failed to acknowledge that it might need to release water from storage to protect the Delta smelt, which could result in reservoir levels falling below that needed to maintain cold waters for salmon in the reservoirs. But

42

the Counties supply no evidence showing that increased releases to protect the Delta smelt are even anticipated. And to the extent the Counties speculate this could occur, speculation is not enough. (*Friends of Riverside's Hills v. City of Riverside* (2018) 26 Cal.App.5th 1137, 1152 [speculation about environmental impacts is insufficient].)

Third, the Counties claim DWR offered conflicting comments about a future "biological opinion" that could affect SWP operations. They reason that DWR said it could not predict the terms of the future biological opinion, but it then, inconsistently, predicted those terms and said they would not affect the majority of release requirements from Lake Oroville. We will discuss later in this opinion the import of certain biological opinions for the SWP. For now, it is enough to say this: The Counties mischaracterize the record. Although the Counties claim that DWR offered conflicting comments about a single biological opinion, the record shows that DWR was discussing two distinct biological opinions. It found it could not predict the terms of a new biological opinion "related to salmonids," and it then found the terms of a new biological opinion "related to Delta smelt" would not affect the majority of release requirements from Oroville.

VI

*The State Water Project*

The Counties next contend DWR failed to account for potential SWP changes that could affect project operations. They raise three arguments on this topic, none of which we find persuasive.

A.      *Biological Opinions*

The Counties' first argument concerns the biological opinions that we mentioned above. Before getting into the substance of the Counties' argument, we start with some background about these opinions—background that the Counties largely neglect to provide.

"When an agency plans to undertake action that might 'adversely affect' a protected species [under the federal Endangered Species Act], the agency must consult

43

with the U.S. Fish and Wildlife Service (FWS) and National Marine Fisheries Service (NMFS) (together, 'Services') before proceeding." (*U.S. Fish and Wildlife Service v. Sierra Club, Inc.* (2021) ___ U.S. ___ [141 S.Ct. 777, 783-784].) "The goal of the consultation is to assist the Services in preparing an official 'biological opinion' on whether the agency's proposal will jeopardize the continued existence of threatened or endangered species." (*Id.* at p. 784.) "If the Services conclude that the action will cause 'jeopardy,' they must propose 'reasonable and prudent alternatives' to the action that would avoid harming the threatened species." (*Ibid.*) In that event, the agency "consulting with the Services" must "either implement the reasonable and prudent alternatives, terminate the action altogether, or seek an exemption from the Endangered Species Committee." (*Ibid.*)

Shortly before DWR released its draft EIR here, FWS and NMFS each prepared a biological opinion evaluating the impacts of two water projects—the SWP and the Central Valley Project—on certain threatened and endangered fish species. (*NRDC, supra*, 506 F.Supp.2d at pp. 328, 331; *Pacific Coast, supra*, 606 F.Supp.2d at pp. 1127-1128.) FWS's opinion considered impacts on the Delta smelt; NMFS's opinion considered impacts on several salmon species. (*NRDC*, at p. 328; *Pacific Coast*, at p. 1127.) But before DWR filed the final EIR here, a federal court found both these opinions inadequate and required the agencies to prepare new biological opinions. (*NRDC*, at pp. 369, 387-388; *Pacific Coast*, at pp. 1184, 1193-1194.)

DWR covered this background in its final EIR. It also responded to comments that the EIR should account for future changes in regulatory requirements, including any changes under the future biological opinions. Starting with the opinion covering salmon, DWR said it anticipated that NMFS would issue a new opinion in winter 2008-2009. DWR added that the federal court could impose interim remedies in the meantime. But it ultimately found it could not "predict at this time what the interim remedies will be or what the new [biological opinion] will contain to protect these fish." Turning to the

opinion covering the Delta smelt, DWR noted that FWS would issue a new opinion in fall 2008.  It also said the federal court had imposed interim remedies to govern SWP operations until the issuance of the new opinion.  But DWR found neither the interim remedies nor the anticipated biological opinion "will affect the majority of release requirements from Oroville."  It added that the required changes—which generally would reduce Oroville releases in early summer and slightly increase releases in summer and early fall—"might increase carryover storage in Lake Oroville," but "[t]hese differences would be minor and would not have an effect on the ability to meet future water temperature or flow objectives in the Feather River below Oroville."

With that background, we turn to the Counties' argument.  Without distinguishing the two biological opinions, the Counties claim DWR's responses were inadequate.  They first claim "DWR vaguely assert[ed] that the 'majority' of release requirements from Oroville would remain unaffected."  But they never acknowledge that DWR went on to specify these release requirements, explaining that they included "[f]lood control releases, Bay-Delta water quality releases, Feather River [Settlement Agreement] water rights deliveries, and in-stream flow releases as required by agreements with [the Department of Fish and Wildlife] and requirements by NMFS in the current [biological opinion]."  The Counties next claim DWR's "assert[ion] that '[it] cannot predict at this time . . . what the new [biological opinion] will contain' " is flawed, because the settlement agreement's stated purpose is to resolve " 'all issues that may arise' in connection with the proposed new project license."  But if DWR cannot predict the terms of the new biological opinion—which not even the Counties appear to dispute—then it cannot resolve potential issues associated with those unknown terms.

B.      *Normal Operations*

The Counties' next argument concerns a provision in the settlement agreement discussing potential reductions in minimum flow releases.  The provision states:  "If the April 1 runoff forecast in a given water year indicates that, under *normal operation* of

45

[the Project], Oroville Reservoir will be drawn to elevation 733 feet (approximately 1,500,000 acre-feet), minimum flows in the [high flow channel] may be diminished on a monthly average basis, in the same proportion as the respective monthly deficiencies imposed upon deliveries for agricultural use from the Project; however, in no case shall the minimum flow releases be reduced by more than 25 percent." (Italics added.) According to the Counties, because the phrase "normal operation" is not defined, "considerable controversy could ensue over whether the 'new' normal or some older version should prevail." The Counties say nothing more on the topic and cite no legal authority.

We fail to understand the Counties' purpose in raising this point. Perhaps they seek only to make a general observation about a perceived ambiguity in the settlement agreement. Or perhaps they believe the potential for future controversy violates some law. To the extent it is the latter, however, we find their unexplained and unsupported argument forfeited. (*Badie, supra*, 67 Cal.App.4th at pp. 784-785.) To the extent, moreover, the Counties seek to unwind the settlement agreement, their position fails for another reason. As our Supreme Court already explained, the Counties can neither challenge the environmental sufficiency of the settlement agreement nor "seek to unwind it." (*County of Butte, supra*, 13 Cal.5th at p. 637.)

C.    *Increased Water Demand*

The Counties' last argument involving the SWP concerns DWR's response to a Water Board comment letter. In the letter, the Water Board asserted that the draft EIR "does not include an adequate discussion of the impact of [SWP] operations on the Proposed Project." It reasoned that the EIR should have considered the potential impacts of increased future demand for SWP water "on the cold water pool available in Lake Oroville." Butte County, raising a similar point in its own comment letter, said the EIR should have considered "changes in SWP deliveries."

In response to the Water Board, DWR stated that "[a]nalysis of future changes to the [SWP] statewide operations is outside the scope of this EIR." And in response to Butte County, DWR stated that it could "only study and model what is currently known, or what can reasonably be foreseen to occur with respect to Project operating rules"; that "[i]t is not possible to predict all potential hypothetical future changes in SWP operating conditions, and how those changes might affect future Lake Oroville operations, within the context of this EIR"; and that "[a]ny future changes in SWP operations materially affecting water deliveries, if outside the current authorizations, would be subject to a separate environmental review and likely a separate EIR."

Challenging this response, the Counties contend DWR improperly treated "the Oroville project and the SWP as analytically distinct," even though "SWP-related downstream pressures will affect upstream demands on project operation in the Feather River and Lake Oroville." The Counties' argument, however, is premised on a misunderstanding of DWR's response. DWR did not find that the Oroville project and the SWP are, in the Counties' words, "analytically distinct." It instead found that unforeseeable changes to SWP operations could not be studied in the EIR and that future material changes to SWP operations would be subject to a separate environmental review if outside current authorizations. DWR also confirmed elsewhere in the EIR that it did not perceive the Oroville project and the SWP to be analytically distinct, including when it acknowledged that SWP water demands and certain future SWP infrastructure improvements would affect project operations.

VII

*Record Costs*

Finally, the Counties contend the amount they were required to pay to prepare the administrative record was too high. As a condition of proceeding to trial, the trial court required the Counties to pay $675,087 to DWR to prepare the 327,261-page record. The Counties paid the amount under protest. Calling this "one of the darkest passages in

47

California's storied water history," the Counties contend the trial court abused its discretion for various reasons, none of which we find persuasive.

We start with some background principles. In CEQA cases, the petitioner must ask the respondent agency to prepare the record, prepare the record itself, or agree to an alternative method of preparing the record, subject to the respondent agency's certification of the record's accuracy. (Pub. Resources Code, § 21167.6, subds. (a), (b)(2).) If the petitioner relies on the agency to prepare the record, as happened in this case, "[t]he parties shall pay any reasonable costs or fees imposed for the preparation of the record of proceedings in conformance with any law or rule of court"—though, should the petitioner prevail in its suit, it is ordinarily able to recover the amounts it paid to prepare the record. (*Id.*, subd. (b)(1); see Code Civ. Proc., § 1095.) " 'Whether a particular cost to prepare an administrative record was necessary and reasonable is an issue for the sound discretion of the trial court. [Citations.] Discretion is abused only when, in its exercise, the court "exceeds the bounds of reason, all of the circumstances being considered." [Citation.] The appellant has the burden of establishing an abuse of discretion.' " (*The Otay Ranch, L.P. v. County of San Diego* (2014) 230 Cal.App.4th 60, 68.)

Challenging the trial court's decision here, the Counties first assert that the costs imposed far exceed those imposed in other cases, are the "most unjustified in CEQA history," and "represent an unprecedented abuse of power." We reject their argument. Although the total amount here may be high, this is not a typical CEQA case. CEQA contemplates that an agency will generally take under 60 days to prepare a record, with more time allotted if appropriate. (Pub. Resources Code, § 21167.6, subds. (b)(1), (c).) But in this case, the evidence shows it took over a year of "intensive and . . . continuous[]" efforts for DWR to prepare the record. It also shows that the record was unusually large, concerned a project spanning more than a decade, and involved hundreds

of DWR employees with potential record materials.  This context—which the Counties never acknowledge—is important.

The price DWR charged per page for preparing the record ($2.06), moreover, was not unprecedented.  The trial court explained as much in its decision, citing *River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154.  In that case, the trial court found reasonable a cost per page of about $2.55 (*id.* at pp. 180-181 [$10,194.05 for 4,000 pages]), and the reviewing court later found the trial court "acted well within its discretion in finding costs claimed by [the agency] were reasonable" (*id.* at pp. 181-182).  Because the Counties neither acknowledge the trial court's reasoning nor show that a charge of $2.06 per page is too high, we find their effort to characterize the trial court's decision as "an unprecedented abuse of power" unpersuasive.  (See *ibid.*; cf. *California Public Records Research, Inc. v. County of Alameda* (2019) 37 Cal.App.5th 800, 803 [county did not "abuse its discretion when it determined that charging $3.50 per page was necessary to recover the direct and indirect costs of making copies"].)  Nor do we find the Counties' efforts to downgrade the trial court judge's credentials, calling him a "pro tem judge," helpful or even accurate.  The judge here has been a judge, not a pro tem judge, for over a decade.

Second, the Counties contend the costs should have been lower because 74,348 pages in the CEQA record "already appear in FERC's official docket for the pending federal Oroville relicensing proceedings."  But the Counties cite nothing to support their stated figure of 74,348 pages.  Nor have they shown any meaningful overlap between the two records.  Although the record does vaguely describe an overlap of "thousands" of pages, that could still mean an overlap of less than one percent given the 327,261-page record here.  Without more information about the extent of the overlap, we are not persuaded that this potentially minimal overlap renders the costs here excessive.  Nor do we find persuasive the Counties' additional claim that they at least expected costs to be lower given the records in the FERC proceeding.  While the Counties may have expected

49

costs to be lower, they provide no authority showing that expectation to be legally significant.

Third, the Counties assert DWR charged "exorbitant sums to prepare the record that [it] certified it had maintained at the time of project approval." (Capitalization removed.) Their reasoning is premised on CEQA Guidelines section 15094, subdivision (b)(9), which, as relevant here, requires a lead agency to notify the public within five working days of project approval "where a copy of the final EIR and the record of project approval may be examined." In the Counties' view, because DWR had an independent duty to maintain the administrative record under CEQA Guidelines section 15094, it could not later charge the Counties for the cost of preparing the record—or at least, it could not charge the Counties as much as it did.

The Counties misinterpret CEQA Guidelines section 15094. That provision, as relevant here, simply requires the lead agency to provide notice of where to find the record materials—which in this case, was DWR's office in downtown Sacramento. It does not require the lead agency to prepare the record for review. Public Resources Code section 21167.6 instead imposes this requirement. It requires the lead agency to prepare the record after a plaintiff has filed suit to challenge the EIR and asked the agency to prepare the record. (Pub. Resources Code, § 21167.6, subds. (a), (b).) It also demonstrates that preparing the record can take a significant amount of time, even after the lead agency has already complied with CEQA Guidelines section 15094. (Pub. Resources Code, § 21167.6, subds. (b)(1), (c).)

Fourth, the Counties contend DWR's costs were excessive because it conducted "200 interviews with employees simply to determine if they had records" and charged "hundreds of hours to perform such tasks as reviewing their own emails and files and for a 'second level' review." The referenced DWR staff person, however, did not *interview* 200 employees to determine if they had records; he instead *contacted* 200 individuals to ask whether they had records. The Counties never explain why contacting individuals to

50

find records was unreasonable.  Although the record shows DWR staff spent significant time reviewing their own e-mails and files, with a few people also conducting "2nd level review of electronic staff files and e-mails," the record also shows that "the EIR for the Oroville Facilities Relicensing project spanned more than a decade and involved dozens of DWR staff at several offices."  Given this context, which the Counties never acknowledge, we are not persuaded that the trial court abused its discretion in finding DWR's cost reasonable.

Fifth, the Counties assert that some of DWR's cost items were inappropriate.  Part of their objection concerns DWR's accounting system.  DWR calculated administrative record costs using an existing accounting system that it has used since 1999 to calculate, among other things, reimbursements for the costs of running the SWP.  DWR's accounting system is intended to capture, for each employee, the "true costs" of that employee's services and includes, among other things, direct employee costs, benefits, and overhead.  Without acknowledging this accounting system and its purpose of capturing true costs, the Counties suggest that DWR acted inappropriately in seeking recovery for employee benefits and their share of overhead.  But they offer no explanation nor any legal authority for challenging DWR's approach, other than to say that DWR acted "brazenly."  We reject their undeveloped argument.  (*Badie, supra*, 67 Cal.App.4th at pp. 784-785; see also *The Otay Ranch, L.P. v. County of San Diego, supra*, 230 Cal.App.4th at pp. 70-71 [an agency can recover "actual" costs when the costs are reasonably and necessarily incurred for preparation of the administrative record; these costs are not "limit[ed] . . . to certain categories"].)

The Counties further object to DWR obtaining reimbursement for costs labeled as "Litigation Expenses" and for the costs for one of its consultants.  Starting with the "Litigation Expenses," the Counties assert that DWR's failure to "distinguish between 'costs' of ministerial record assembly and 'costs' of litigation defense vitiates a claim for recovery of any of these dollars."  But DWR explained the "Litigation" category in a

51

declaration in the trial court proceedings. It explained it "created a cost object called 'Litigation' " after the Counties filed suit and then instructed all staff "to assign line staff work, consultant fees, and other costs incurred in assembling and preparing the administrative record to this cost object." Because the Counties fail to dispute or even acknowledge this evidence, they have failed to meet their burden to show that the trial court abused its discretion.

Turning to the consultant's costs, the Counties contend one consultant's task orders "fail[ed] to segregate work on the merits from work on CEQA review" and assigned both the same billing number. They add that the consultant's timesheets appear to include time spent on defending the EIR. But in a declaration in the trial court proceedings, DWR described its efforts to address this issue. It explained that it "examined the charges to ensure that the tasks billed were for record preparation only" and "removed [the consultant's] charges from the final bill for record preparation that did not relate[] to preparation of the administrative record and assigned them to a separate task order." Because the Counties never explain how this effort fell short, nor even acknowledge this effort to remove inappropriate charges, they have not demonstrated that the trial court abused its discretion. (See *Najera v. Huerta* (2011) 191 Cal.App.4th 872, 877 ["On appeal, the burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown along with a miscarriage of justice, a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power"].)

Lastly, the Counties argue that the cost award should be set aside because it was oppressively high. But even when costs are high, Public Resources Code section 21167.6, subdivision (b)(1) still says that the "[t]he parties shall pay any reasonable costs or fees imposed for the preparation of the record of proceedings in conformance with any law or rule of court." Because the Counties offer neither authority nor a rational explanation for evading this requirement, we reject their argument. (*Badie, supra*, 67

Cal.App.4th at pp. 784-785.) We also find their efforts to bolster this argument in their reply brief fall short. They first suggest that DWR purposefully "r[a]n up the cost bill" because it disliked them. They then claim that DWR artificially increased the cost bill to solve budget difficulties. We reject these baseless claims, neither of which are supported with any citation to the record.[11]

## DISPOSITION

The judgment is affirmed. Respondents are entitled to recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)


                                         /s/
                                 BOULWARE EURIE, J.


We concur:


    /s/
ROBIE, Acting P. J.


    /s/
HULL, J.

---

[11] In their reply brief and in footnotes to their opening brief, the Counties also argue that costs should have been substantially lower because DWR wrongly charged for staff time spent on "modeling" and because this case involves an electronic, not paper, record. Again, however, we decline to address arguments raised in footnotes and in the reply brief. (*Holden, supra*, 43 Cal.App.5th at pp. 419-420; *Neighbours v. Buzz Oates Enterprises, supra*, 217 Cal.App.3d at p. 335, fn. 8.)